**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

BASHE ABDI YOUSUF; JOHN DOE 1;
JOHN DOE 2; AZIZ DERIA,

>> *Plaintiffs-Appellees,*

>> and

JOHN DOE 3; JOHN DOE 4; JANE
DOE 1,

>> *Plaintiffs,*

No. 11-1479

>> v.

MOHAMED ALI SAMANTAR,

>> *Defendant-Appellant.*

UNITED STATES OF AMERICA,

>> *Amicus Supporting Appellees.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(1:04-cv-01360-LMB-JFA)

Argued: May 16, 2012

Decided: November 2, 2012

Before TRAXLER, Chief Judge, and KING and DUNCAN,
Circuit Judges.

Affirmed by published opinion. Chief Judge Traxler wrote the opinion, in which Judge King and Judge Duncan joined.

---

**COUNSEL**

**ARGUED:** Joseph Peter Drennan, Alexandria, Virginia, for Appellant. James Edward Tysse, AKIN, GUMP, STRAUSS, HAUER & FELD, LLP, Washington, D.C., for Appellees. Lewis Yelin, UNITED STATES DEPARTMENT OF JUS-TICE, Washington, D.C., for Amicus Supporting Appellees. **ON BRIEF:** Natasha E. Fain, CENTER FOR JUSTICE & ACCOUNTABILITY, San Francisco, California; Patricia A. Millett, Steven H. Schulman, AKIN, GUMP, STRAUSS, HAUER & FELD, LLP, Washington, D.C., for Appellees. Harold Hongju Koh, Legal Adviser, DEPARTMENT OF STATE, Washington, D.C.; Tony West, Assistant Attorney General, Douglas N. Letter, UNITED STATES DEPART-MENT OF JUSTICE, Washington, D.C.; Neil H. MacBride, United States Attorney, Alexandria, Virginia, for Amicus Supporting Appellees.

---

**OPINION**

TRAXLER, Chief Judge:

For the second time in this case, we are presented with the question of whether Appellant Mohamed Ali Samantar enjoys immunity from suit under the Torture Victim Protection Act of 1991 ("TVPA"), *see* Pub. L. 102-256, 106 Stat. 73 (1992), 28 U.S.C. § 1350 note, and the Alien Tort Statute ("ATS"), *see* 28 U.S.C. § 1350. In the previous appeal, we rejected Samantar's claim to statutory immunity under the Foreign Sovereign Immunities Act ("FSIA"), *see* 28 U.S.C. §§ 1602-1611, but held open the possibility that Samantar could "successfully invoke an immunity doctrine arising under pre-FSIA

common law." *Yousuf v. Samantar*, 552 F.3d 371, 383-84 (4th Cir. 2009). The Supreme Court affirmed our reading of the FSIA and likewise suggested Samantar would have the opportunity to assert common law immunity on remand. *See Samantar v. Yousuf*, 130 S. Ct. 2278, 2293 (2010) (noting that the viability of a common law immunity defense was a "matter[ ] to be addressed in the first instance by the District Court").

On remand to the district court, Samantar sought dismissal of the claims against him based on common law immunities afforded to heads of state and also to other foreign officials for acts performed in their official capacity. The district court rejected his claims for immunity and denied the motion to dismiss. *See Yousuf v. Samantar*, 2011 WL 7445583 (E.D. Va. Feb. 15, 2011). For the reasons that follow, we agree with the district court and affirm its decision.

I.

Because our previous opinion recounted the underlying facts at length, *see Samantar*, 552 F.3d at 373-74, we will provide only a brief summary here. Samantar was a high-ranking government official in Somalia while the military regime of General Mohamed Barre held power from about 1969 to 1991. Plaintiffs are natives of Somalia and members of the "prosperous and well-educated Isaaq clan, which the [Barre] government viewed as a threat." *Id.* at 373. Plaintiffs allege that they, or members of their families, were subjected to "torture, arbitrary detention and extrajudicial killing" by government agents under the command and control of Samantar, who served as "Minister of Defense from January 1980 to December 1986, and as Prime Minister from January 1987 to September 1990." *Id.* at 374 (internal quotation marks omitted). Following the collapse of the Barre regime in January 1991, Samantar fled Somalia for the United States. He now resides in Virginia as a permanent legal resident. Two of the

plaintiffs also reside in the United States, having become naturalized citizens.

Plaintiffs brought a civil action against Samantar under the TVPA and the ATS. *See* 28 U.S.C. § 1350 and note. Samantar moved to dismiss plaintiffs' claims on the ground that he was immune from suit under the FSIA, and the district court dismissed the case. This court reversed, however, concluding that the FSIA applies to sovereign *states* but not "to individual foreign government agents." *Samantar*, 552 F.3d at 381. We remanded the case for the district court to consider whether Samantar could "successfully invoke an immunity doctrine arising under pre-FSIA common law." *Id.* at 383-84.

The Supreme Court granted Samantar's petition for certiorari and affirmed our decision, holding that the FSIA—based on its text, purpose and history—governs only foreign state sovereign immunity, not the immunity of individual officials. *See Samantar*, 130 S. Ct. at 2289 ("Reading the FSIA as a whole, there is nothing to suggest we should read 'foreign state' in § 1603(a) to include an official acting on behalf of the foreign state, and much to indicate that this meaning was not what Congress enacted."). It is now clear after *Samantar* that the common law, not the FSIA, governs the claims to immunity of individual foreign officials. *See id.* at 2292 ("[W]e think this case, in which respondents have sued [Samantar] in his personal capacity and seek damages from his own pockets, is properly governed by the common law because it is not a claim against a foreign state as the [FSIA] defines that term.").

On remand, Samantar renewed his motion to dismiss based on two common law immunity doctrines. First, Samantar alleged he was entitled to head-of-state immunity because at least some of the alleged wrongdoing occurred while Samantar was Prime Minister. Second, Samantar sought foreign official immunity on the basis that any actions for which the

plaintiffs sought to hold him responsible were taken in the course and scope of his official duties.

The district court renewed its request to the State Department for a response to Samantar's immunity claims. Despite having remained silent during Samantar's first appeal, the State Department here took a position expressly opposing immunity for Samantar. The United States submitted to the district court a Statement of Interest (SOI) announcing that the Department of State, having considered "the potential impact of such a[n] [immunity] decision on the foreign relations interests of the United States," J.A. 73, had determined that Samantar was not entitled to immunity from plaintiffs' lawsuit. The SOI indicated that two factors were particularly important to the State Department's determination that Samantar should not enjoy immunity. First, the State Department concluded that Samantar's claim for immunity was undermined by the fact that he "is a former official of a state with no currently recognized government to request immunity on his behalf," or to take a position as to "whether the acts in question were taken in an official capacity." J.A. 71. Noting that "[t]he immunity protecting foreign officials for their official acts ultimately belongs to the sovereign rather than the official," J.A. 71, the government reasoned that Samantar should not be afforded immunity "[i]n the absence of a recognized government . . . to assert or waive [Samantar's] immunity," J.A. 73. Second, Samantar's status as a permanent legal resident was particularly relevant to the State Department's immunity determination. According to the SOI, "U.S. residents like Samantar who enjoy the protections of U.S. law ordinarily should be subject to the jurisdiction of our courts, particularly when sued by U.S. residents" or naturalized citizens such as two of the plaintiffs. J.A. 71.

The district court denied Samantar's motion to dismiss, apparently viewing the Department of State's position as controlling and surrendering jurisdiction over the issue to the State Department: "The government has determined that the

defendant does not have foreign official immunity. Accordingly, defendant's common law sovereign immunity defense is no longer before the Court, which will now proceed to consider the remaining issues in defendant's Motion to Dismiss." *Samantar*, 2011 WL 7445583, at *1. But, in denying Samantar's subsequent motion to reconsider, the district court implied that it performed its own analysis and merely took the State Department's view into account: "The Executive Branch has spoken on this issue and . . . [is] entitled to a great deal of deference. *They don't control but they are entitled to deference in this case*." J.A. 81 (emphasis added). The district court noted that both "the residency of the defendant" and "the lack of a recognized government" were factors properly considered in the immunity calculus. J.A. 82.

Samantar immediately appealed the district court's denial of common law immunity.[1] Samantar advances a two-fold argument. First, he contends that the order denying him immunity cannot stand because the district court improperly deferred to the Department of State and abdicated its duty to independently assess his immunity claim. In contrast to the view offered by the United States in its amicus brief that the State Department is owed absolute deference from the courts on any question of foreign sovereign immunity, Samantar claims that deference to the Executive's immunity determination is appropriate only when the State Department recommends that immunity be *granted*. Second, Samantar argues that under the common law, he is entitled to immunity for all actions taken within the scope of his duties and in his capacity as a foreign government official, and that he is immune to any

---

[1] A pretrial order denying sovereign immunity is immediately appealable under the collateral-order exception to the final judgment rule. *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). This court has previously determined that an order denying a claim of sovereign immunity under the FSIA is immediately appealable. *See Rux v. Republic of Sudan*, 461 F.3d 461, 467 n.1 (4th Cir. 2006). We see no reason to draw a distinction in this regard for orders denying claims of sovereign immunity under the common law.

claims alleging wrongdoing while he was the Somali Prime Minister. We address these arguments below.

## II.

Before proceeding further, we must decide the appropriate level of deference courts should give the Executive Branch's view on case-specific questions of individual foreign sovereign immunity. The FSIA displaced the common law regime for resolving questions of foreign *state* immunity and shifted the Executive's role as primary decision maker to the courts. *See Samantar*, 130 S. Ct. at 2285. After *Samantar*, it is clear that the FSIA did no such thing with respect to the immunity of *individual* foreign officials; the common law, not the FSIA, continues to govern foreign official immunity. *See id.* at 2292. And, in light of the continued viability of the common law for such claims, the Court saw "no reason to believe that Congress saw as a problem, or wanted to eliminate, the State Department's role in determinations regarding individual official immunity" under the common law. *Id.* at 2291. The extent of the State Department's role, however, depends in large part on what kind of immunity has been asserted.

## A.

In this case, Samantar claims two forms of immunity: (1) head-of-state immunity and (2) "foreign official" or "official acts" immunity. "Head-of-state immunity is a doctrine of customary international law" pursuant to which an incumbent "head of state is immune from the jurisdiction of a foreign state's courts." *In re Grand Jury Proceedings*, 817 F.2d 1108, 1110 (4th Cir. 1987). "Like the related doctrine of sovereign [state] immunity, the rationale of head-of-state immunity is to promote comity among nations by ensuring that leaders can perform their duties without being subject to detention, arrest or embarrassment in a foreign country's legal system." *Id.*

"A head-of-state recognized by the United States government is absolutely immune from personal jurisdiction in United States courts unless that immunity has been waived by statute or by the foreign government recognized by the United States." *Lafontant v. Aristide*, 844 F. Supp. 128, 131-32 (E.D.N.Y. 1994). Although all forms of individual immunity derive from the State, head-of-state immunity is tied closely to the sovereign immunity of foreign states. *See Restatement (Second) of Foreign Relations Law* § 66(b) ("The immunity of a foreign state . . . extends to . . . its head of state"). Indeed, head-of-state immunity "is premised on the concept that a state and its ruler are one for purposes of immunity." *Lafontant*, 844 F. Supp. at 132.[2]

Samantar also seeks immunity on the separate ground that all of the actions for which plaintiffs seek to hold him liable occurred during the course of his official duties within the Somali government. *See Restatement (Second) of Foreign Relations Law* § 66(f) (stating that "[t]he immunity of a foreign state . . . extends to . . . any . . . public minister, official, or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state"); *Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009) ("At the time the FSIA was enacted, the common law of foreign sovereign immunity recognized an individual official's entitlement to immunity for acts performed in his official capacity.") (internal quotation marks omitted); *Samantar*, 130 S. Ct. at 2290-91 ("[W]e do not doubt that in some circumstances the immunity of the foreign state extends to an individual for acts taken in his official capacity."). This is a conduct-based immunity that applies to

---

[2]"Under customary international law, head of state immunity encompasses the immunity of not only the heads of state but also of other 'holders of high-ranking office in a State' such as 'the Head of Government and Minister of Foreign Affairs.'" Lewis S. Yelin, *Head of State Immunity As Sole Executive Lawmaking*, 44 Vand. J. Transnat'l L. 911, 921 n.42 (2011).

current and former foreign officials. *See Matar*, 563 F.3d at 14 ("An immunity based on acts—rather than status—does not depend on tenure in office.").

B.

The United States, participating as *amicus curiae*, takes the position that federal courts owe absolute deference to the State Department's view of whether a foreign official is entitled to sovereign immunity on either ground. According to the government, under long-established Supreme Court precedent, the State Department's opinion on any foreign immunity issue is binding upon the courts. The State Department's position allows for the federal courts to function as independent decision makers on foreign sovereign immunity questions in only one instance: when the State Department remains silent on a particular case.[3] Thus, the United States contends that the State Department resolved the issues once it presented the district court with its view that Samantar was not entitled to immunity.

Samantar, by contrast, advocates the view that deference to the Executive's immunity determination is required *only when the State Department explicitly recommends that immunity be granted*. Samantar argues that when the State Department concludes, as it did in this case, that a foreign official is *not* entitled to immunity or remains silent on the issue, courts can and must decide independently whether to grant immunity. And, the plaintiffs offer yet a third view, suggesting that the State Department's position on foreign sovereign immunity does not completely control, but that courts must defer "to the reasonable views of the Executive Branch" regardless of whether the State Department suggests that immunity be

---

[3]Even then, however, the State Department insists that the courts must fashion a decision based on principles that it has articulated. *See Samantar*, 130 S. Ct. at 2284. In making this argument, the government fails to distinguish between status-based and conduct-based immunity.

granted or denied. Appellees' Response Brief at 20. In this case, plaintiffs contend the State Department's rationale for urging denial of immunity, as set forth in its SOI, was reasonable and that the district court properly deferred to it.

### 1.   Executive's Pre-FSIA Role in Foreign State Immunity

We begin by observing that, although the doctrine of foreign sovereign immunity has well-established roots in American jurisprudence, the Executive Branch's assumption of the role of primary decision-maker on various foreign sovereign immunity matters is of a more recent vintage. Foreign sovereign immunity, insofar as American courts are concerned, has its doctrinal roots in *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812), which ushered in nearly a century of "absolute" or "classical" immunity, "under which a sovereign [could not], without his consent, be made a respondent in the courts of another sovereign." *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 199 (2007) (internal quotation marks omitted); *see Samantar*, 130 S. Ct. at 2284 (explaining *The Schooner Exchange* "was interpreted as extending virtually absolute immunity to foreign sovereigns as a matter of grace and comity") (internal quotation marks omitted).[4] "Absolute" immunity for the foreign sovereign, however, is not to be confused with absolute judicial deference to the Executive Branch. In fact, during the lengthy period of absolute immunity, courts did not necessarily consider themselves obliged to follow executive pronouncements regarding immunity. In *The Schooner Exchange* itself, for example, the Court received and considered the view of the Executive Branch on the immunity claim but conducted its own independent review of

---

[4]For nearly a century, "foreign sovereigns in national courts enjoyed a high level of immunity and exceptions, if any, were not widely recognized." Wuerth, Ingrid, *Foreign Official Immunity Determinations in U.S. Courts: The Case Against the State Dep't*, 51 Va. J. Int'l Law 915, 925 (2011).

the relevant international law doctrines. *See* 11 U.S. (7 Cranch) at 132-35; 136-47. As late as the 1920s, the Court still did not necessarily view questions of foreign sovereign immunity as matters solely for the Executive Branch. For example, the Court in *Berizzi Bros. Co. v. Steamship Pesaro*, 271 U.S. 562, 576 (1926), concluded that a steamship owned by a foreign sovereign was entitled to immunity despite the fact that the Secretary of State had expressed the opposite view earlier in the litigation. *See The Pesaro*, 277 F. 473, 479 n.3 (S.D.N.Y. 1921).

It was not until the late 1930s—in the context of in rem actions against foreign ships—that judicial deference to executive foreign immunity determinations emerged as standard practice. *See Compania Espanola de Navegacion Maritima, S.A. v. The Navemar*, 303 U.S. 68, 74 (1938) ("If the claim is recognized and allowed by the executive branch of the government, it is then the duty of the courts to release the vessel upon appropriate suggestion by the Attorney General of the United States, or other officer acting under his direction."); *Ex parte Republic of Peru*, 318 U.S. 578, 587-89 (1943); *Republic of Mexico v. Hoffman*, 324 U.S. 30, 34-36 (1945). Citing a line of cases involving ships owned by foreign sovereigns, *Samantar* explained that

> a two-step procedure developed for resolving a foreign state's claim of sovereign immunity, typically asserted on behalf of seized vessels. *See, e.g.*, *Republic of Mexico v. Hoffman*, 324 U.S. 30, 34–36 (1945); *Ex parte Peru*, 318 U.S. 578, 587–589 (1943); *Compania Espanola de Navegacion Maritima, S.A. v. The Navemar*, 303 U.S. 68, 74–75 (1938). Under that procedure, the diplomatic representative of the sovereign could request a "suggestion of immunity" from the State Department. *Ex parte Peru*, 318 U.S. at 581. If the request was granted, the district court surrendered its jurisdiction. *Id.* at 588; *see also Hoffman*, 324 U.S. at 34. But "in

the absence of recognition of the immunity by the Department of State," a district court "had authority to decide for itself whether all the requisites for such immunity existed." *Ex parte Peru*, 318 U.S. at 587; *see also Compania Espanola*, 303 U.S. at 75 (approving judicial inquiry into sovereign immunity when the "Department of State . . . declined to act"); *Heaney v. Government of Spain*, 445 F.2d 501, 503, and n.2 (2d Cir. 1971) (evaluating sovereign immunity when the State Department had not responded to a request for its views). In making that decision, a district court inquired "whether the ground of immunity is one which it is the established policy of the [State Department] to recognize." *Hoffman*, 324 U.S. at 36.

*Samantar*, 130 S. Ct. at 2284 (citations omitted; alteration in original). Subsequently, there was a shift in State Department policy from a theory of absolute immunity to restrictive immunity, but this shift "had little, if any, impact on federal courts' approach to immunity analyses . . . and courts continued to abide by that Department's suggestions of immunity." *Republic of Austria v. Altmann*, 541 U.S. 677, 690 (2004) (internal quotation marks and alteration omitted).[5] Thus, at the time that Congress enacted the FSIA, the clearly established

---

[5]Interestingly, even at this point the State Department expressed uncertainty about the relationship between the executive and judicial branches on questions of foreign sovereign immunity. The State Department announced its change in policy through a 1952 letter to the Attorney General from Jack B. Tate, Legal Adviser to the State Department. The "Tate Letter," as it has come to be known, stated that "[i]t is realized that a shift in policy by the executive cannot control the courts but it is felt that the courts are less likely to allow a plea of sovereign immunity where the executive has declined to do so." *See* Letter from Jack B. Tate, Acting Legal Adviser, Dep't of State, to Philip B. Perlman, Acting Att'y Gen. (May 19, 1952), 26 Dep't St. Bull. 984-85 (1952), *reprinted in Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 714 app. 2 (1976).

practice of judicial deference to executive immunity determinations had been expressed largely in admiralty cases.

In this pre-FSIA era, decisions involving claims of *individual* foreign sovereign immunity were scarce. *See Samantar*, 130 S. Ct. at 2291 (noting that "questions of official immunity . . . in the pre-FSIA period . . . were few and far between"). But, to the extent such individual claims arose, they generally involved status-based immunities such as head-of-state immunity, *see, e.g.*, *Ye v. Zemin*, 383 F.3d 620, 624-25 (7th Cir. 2004), or diplomatic immunity arising under international treaties, *see* Vienna Convention on Consular Relations art. 43, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261; Vienna Convention on Diplomatic Relations art. 31, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95. The rare cases involving immunity asserted by lower-level foreign officials provided inconsistent results. *See generally* Chimene I. Keitner, *The Common Law of Foreign Official Immunity*, 14 *Green Bag* 2d 61 (2010) [hereinafter Keitner].

### 2. Executive Power

The Constitution assigns the power to "receive Ambassadors and other public Ministers" to the Executive Branch, U.S. Const. art. II, § 3, which includes, by implication, the power to accredit diplomats and recognize foreign heads of state. Courts have generally treated executive "suggestions of immunity" for heads of state as a function of the Executive's constitutional power and, therefore, as controlling on the judiciary. *See*, *e.g.*, *Ye*, 383 F.3d at 626 ("[A] determination by the Executive Branch that a foreign head of state is immune from suit is conclusive and a court must accept such a determination without reference to the underlying claims of a plaintiff."); *Doe v. State of Israel*, 400 F. Supp. 2d 86, 111 (D.D.C. 2005) ("When, as here, the Executive has filed a Suggestion of Immunity as to a recognized head of a foreign state, the jurisdiction of the Judicial Branch immediately ceases."); *United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir.

1997) (deferring to the Executive Branch where it "manifested its clear sentiment that Noriega should be denied head-of-state immunity"); *see generally* Keitner, 14 *Green Bag* 2d at 71 (reasoning that "[c]ourts should treat Executive representations about status-based immunity as conclusive because they are a function of the Executive's power under Article II, section 3 of the Constitution"). Like diplomatic immunity, head-of-state immunity involves "a formal act of recognition," that is "a quintessentially executive function" for which absolute deference is proper. Peter B. Rutledge, *Samantar, Official Immunity & Federal Common Law*, 15 Lewis & Clark L. Rev. 589, 606 (2011).

Accordingly, consistent with the Executive's constitutionally delegated powers and the historical practice of the courts, we conclude that the State Department's pronouncement as to head-of-state immunity is entitled to absolute deference. The State Department has never recognized Samantar as the head of state for Somalia; indeed, the State Department does not recognize the Transitional Federal Government or any other entity as the official government of Somalia, from which immunity would derive in the first place. The district court properly deferred to the State Department's position that Samantar be denied head-of-state immunity.

Unlike head-of-state immunity and other status-based immunities, there is no equivalent constitutional basis suggesting that the views of the Executive Branch control questions of foreign official immunity. Such cases do not involve any act of recognition for which the Executive Branch is constitutionally empowered; rather, they simply involve matters about the scope of defendant's official duties.

This is not to say, however, that the Executive Branch has no role to play in such suits. These immunity decisions turn upon principles of customary international law and foreign policy, areas in which the courts respect, but do not automatically follow, the views of the Executive Branch. *See Sosa v.*

*Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004) (noting that "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of [a] case's impact on foreign policy"); *Altmann*, 541 U.S. at 702 (suggesting that with respect to foreign sovereign immunity, "should the State Department choose to express its opinion on the implications of exercising jurisdiction over *particular* petitioners in connection with *their* alleged conduct, that opinion might well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy") (footnote omitted). With respect to foreign official immunity, the Executive Branch still informs the court about the diplomatic effect of the court's exercising jurisdiction over claims against an official of a foreign state, and the Executive Branch may urge the court to grant or deny official-act immunity based on such considerations. "That function, however, concerns the general assessment of a case's impact on the foreign relations of the United States," Rutledge, 15 Lewis & Clark L. Rev. at 606, rather than a controlling determination of whether an individual is entitled to conduct-based immunity.

In sum, we give absolute deference to the State Department's position on status-based immunity doctrines such as head-of-state immunity. The State Department's determination regarding conduct-based immunity, by contrast, is not controlling, but it carries substantial weight in our analysis of the issue.

III.

A.

We turn to the remaining question of whether Samantar is entitled to foreign official immunity under the common law. In considering the contours of foreign official immunity, we must draw from the relevant principles found in both international and domestic immunity law, as well as the experience

and judgment of the State Department, to which we give considerable, but not controlling, weight.

From the earliest Supreme Court decisions, international law has shaped the development of the common law of foreign sovereign immunity. *See The Schooner Exchange*, 11 U.S. (7 *Cranch*) at 136, 145-46 (noting that "a principle of public law" derived from "common usage" and "common opinion" that "national ships of war, entering the port of a friendly power open for their reception, are to be considered as exempted by the consent of that power from its jurisdiction"); *Restatement (Third) of the Foreign Relations Law* part IV, ch. 5, subch. A intro. note ("The immunity of a state from the jurisdiction of the courts of another state is an undisputed principle of customary international law."). Indeed, an important purpose of the FSIA was the "codification of international law at the time of the FSIA's enactment." *Samantar*, 130 S. Ct. at 2289 (internal quotation marks omitted); *see id.* ("[O]ne of the primary purposes of the FSIA was to codify the restrictive theory of sovereign immunity, which Congress recognized as consistent with extant international law."). Even after the FSIA was enacted, international law continued to be relevant to questions of foreign sovereign immunity as the Court interpreted the FSIA in light of international law. *See Permanent Mission of India*, 551 U.S. at 200-01.

As previously noted, customary international law has long distinguished between status-based immunity afforded to sitting heads-of-state and conduct-based immunity available to other foreign officials, including former heads-of-state. With respect to conduct-based immunity, foreign officials are immune from "claims arising out of their official acts while in office." *Restatement (Third) of Foreign Relations Law* § 464, reprt. note 14; *Matar*, 563 F.3d at 14 ("An immunity based on acts—rather than status—does not depend on tenure in office."). This type of immunity stands on the foreign official's actions, not his or her status, and therefore applies whether the individual is currently a government official or

not. *See* Chimene I. Keitner, *Officially Immune? A Response to Bradley and Goldsmith*, 36 Yale J. Int'l L. Online 1, *9 (2010) ("Conduct-based immunity is both narrower and broader than status-based immunity: it is narrower, because it only provides immunity for specific acts . . . but it is also broader, because it endures even after an individual has left office."). This conduct-based immunity for a foreign official derives from the immunity of the State: "The doctrine of the imputability of the acts of the individual to the State . . . in classical law . . . imputes the act solely to the state, who alone is responsible for its consequence. In consequence any act performed by the individual as an act of the State enjoys the immunity which the State enjoys." Hazel Fox, *The Law of State Immunity* at 455 (2d ed. 2008).

At least as early as its decision in *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897), the Supreme Court embraced the international law principle that sovereign immunity, which belongs to a foreign *state*, extends to an individual *official* acting on behalf of that foreign state. By the time the FSIA was enacted, numerous domestic courts had embraced the notion, stemming from international law, that "[t]he immunity of a foreign state . . . extends to . . . any . . . public minister, official, or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state." *Restatement (Second) of Foreign Relations Law* § 66(f). Although the context for these cases was different—almost all involved the erroneous (pre-*Samantar*) application of the FSIA to individual foreign officials claiming immunity—these decisions are instructive for post-*Samantar* questions of common law immunity. *See, e.g.*, *Belhas v. Ya'alon*, 515 F.3d 1279, 1285 (D.C. Cir. 2008) (observing that the FSIA had incorporated the well-settled principle of international law that former officials could still claim immunity for acts performed on behalf of the government); *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1106 (9th Cir. 1990) (recognizing that an individual is not "entitled to sovereign immunity for acts not com-

mitted in his official capacity" and explaining that where "the officer purports to act as an individual and not as an official, a suit directed against that action is not a suit against the sovereign") (internal quotation marks omitted); *Hilao v. Estate of Marcos (In re Estate of Ferdinand Marcos, Human Rights Litigation)*, 25 F.3d 1467, 1472 (9th Cir. 1994) (stating that "[i]mmunity is extended to an individual only when acting *on behalf* of the state because actions against those individuals are the practical equivalent of a suit against the sovereign directly" and that "[a] lawsuit against a foreign official acting outside the scope of his authority does not implicate any of the foreign diplomatic concerns involved in bringing suit against another government in United States courts") (internal quotation marks omitted); *Matar*, 563 F.3d at 14 (concluding that even if Dichter was not entitled to statutory immunity under the FSIA, he was "nevertheless immune from suit under common-law principles [*i.e.*, conduct-based foreign official immunity] that pre-date, and survive, the enactment of that statute").

These cases sketch out the general contours of official-act immunity: a foreign official may assert immunity for official acts performed within the scope of his duty, but not for private acts where "the officer purports to act as an individual and not as an official, [such that] a suit directed against that action is not a suit against the sovereign." *Chuidian*, 912 F.2d at 1106 (internal quotation marks omitted). A foreign official or former head-of-state will therefore not be able to assert this immunity for private acts that are not arguably attributable to the state, such as drug possession or fraud. *See, e.g.*, *In re Doe*, 860 F.2d 40, 45 (2d Cir. 1988) ("[W]ere we to reach the merits of the issue, we believe there is respectable authority for denying head-of-state immunity to a former head-of-state for private or criminal acts in violation of American law.").

## B.

In response, plaintiffs contend that Samantar cannot raise this immunity as a shield against atrocities such as torture, genocide, indiscriminate executions and prolonged arbitrary imprisonment or any other act that would violate a *jus cogens* norm of international law. A *jus cogens* norm, also known as a "peremptory norm of general international law," can be defined as "a norm accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character." *Vienna Convention on the Law of Treaties* art. 53, May 23, 1969, 1155 U.N.T.S. 331; *see Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992) (adopting same definition). Prohibitions against the acts involved in this case—torture, summary execution and prolonged arbitrary imprisonment—are among these universally agreed-upon norms. *See, e.g.*, Evan J. Criddle & Evan Fox-Decent, *A Fiduciary Theory of Jus Cogens*, 34 Yale J. Int'l L. 331, 331 (2009) (explaining that "jus cogens . . . include[s], at a minimum, the prohibitions against genocide; slavery or slave trade; murder or disappearance of individuals; torture or other cruel, inhuman, or degrading treatment or punishment; prolonged arbitrary detention"); *Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774, 791 n.20 (D.C. Cir. 1984) (Edwards, J., concurring) ("On the basis of international covenants, agreements and declarations, commentators have identified at least four acts that are now subject to unequivocal international condemnation: torture, summary execution, genocide and slavery."); *Restatement (Third) of Foreign Relations Law* § 702 and cmt. n (identifying murder, torture and "prolonged arbitrary detention" as *jus cogens* violations). Unlike private acts that do not come within the scope of foreign official immunity, *jus cogens* violations may well be committed under color of law and, in that sense, constitute acts performed in the course of the foreign official's employment by the Sovereign. However, as a matter of international and domestic law, *jus cogens* violations are, by definition, acts that are not officially authorized by the Sovereign. *See, e.g.*, *Siderman de*

*Blake*, 965 F.2d at 718 ("International law does not recognize an act that violates jus cogens as a sovereign act."); *Paul v. Avril*, 812 F. Supp. 207, 212 (S.D. Fla. 1993) ("[A]cts . . . [of torture, cruel, inhuman and degrading treatment, and arbitrary detention in violation of customary international law] hardly qualify as official public acts.").[6]

There has been an increasing trend in international law to abrogate foreign official immunity for individuals who commit acts, otherwise attributable to the State, that violate *jus cogens* norms—*i.e.*, they commit international crimes or human rights violations:

> Over the last decade . . . a growing number of domestic and international judicial decisions have considered whether a foreign official acts as an arm of the state, and thus is entitled to conduct immunity, when that official allegedly violates a *jus cogens* norm of international law or commits an international crime.

Curtis A. Bradley & Laurence R. Helfer, *International Law and the U.S. Common Law of Foreign Official Immunity*, 2010 Sup. Ct. Rev. 213, 236-37 (2011). A number of decisions from foreign national courts have reflected a willingness to deny official-act immunity in the criminal context for alleged *jus cogens* violations, most notably the British House of Lords' *Pinochet* decision denying official-acts immunity to a former Chilean head of state accused of directing widespread torture. *See Regina v. Bartle, ex parte Pinochet*, 38 I.L.M. 581, 593-95 (H.L. 1999) (concluding that official-acts

---

[6]In spite of this, allegations of *jus cogens* violations do not overcome head-of-state or any other status-based immunity. *See, e.g.*, *Case Concerning the Arrest Warrant of 11 April 2000 (Democratic Republic of Congo v. Belgium) (2002)* ICJ 3 (concluding that the sitting foreign minister of the Democratic Republic of Congo was entitled to status-based immunity against alleged *jus cogens* violations).

immunity is unavailable to shield foreign officials from prosecution for international crimes because acts of torture do not constitute officially-approved acts). "In the decade following *Pinochet*, courts and prosecutors across Europe and elsewhere . . . commenced criminal proceedings against former officials of other nations for torture and other violations of *jus cogens*." Bradley & Helfer, 2010 Sup. Ct. Rev. at 239. Some foreign national courts have pierced the veil of official-acts immunity to hear civil claims alleging *jus cogens* violations, but the *jus cogens* exception appears to be less settled in the civil context. *Compare Ferrini v. Germany*, Oxford Rep Int'l in Dom Cts 19 (Italian Ct. of Cassation 2004) (denying "the functional immunity of foreign state organs" for *jus cogens* violations in criminal context), *with Jones v. Saudi Arabia*, 129 I.L.R. 713, at ¶ 24 (H.L. 2006) (rejecting *jus cogens* exception to foreign official immunity in civil context).

American courts have generally followed the foregoing trend, concluding that *jus cogens* violations are not legitimate official acts and therefore do not merit foreign official immunity but still recognizing that head-of-state immunity, based on status, is of an absolute nature and applies even against *jus cogens* claims. *Compare Sarei v. Rio Tinto, PLC*, 487 F.3d 1193, 1209 (9th Cir. 2007) (recognizing that acts in "violation[ ] of jus cogens norms . . . cannot constitute official sovereign acts"); *Siderman de Blake*, 965 F.2d at 718 ("International law does not recognize an act that violates *jus cogens* as a sovereign act."); *Enahoro v. Abubakar*, 408 F.3d 877, 893 (7th Cir. 2005) (Cudahy, J., dissenting) ("[O]fficials receive no immunity for acts that violate international *jus cogens* human rights norms (which by definition are not legally authorized acts)."), *with Ye*, 383 F.3d at 626-27 (deferring to Executive's suggestion that head-of-state immunity be allowed for individual accused of international crimes); *Devi v. Rajapaksa*, No. 11 Civ. 6634, 2012 WL 3866495, at *3 (S.D.N.Y. Sept. 4, 2012) (holding that a sitting head of state is entitled to immunity, even in the context of alleged *jus cogens* violations). We conclude that, under international and

domestic law, officials from other countries are not entitled to foreign official immunity for *jus cogens* violations, even if the acts were performed in the defendant's official capacity.

Moreover, we find Congress's enactment of the TVPA, and the policies it reflects, to be both instructive and consistent with our view of the common law regarding these aspects of *jus cogens*. Plaintiffs asserted claims against Samantar under the TVPA which authorizes a civil cause of action against "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture" or "extrajudicial killing." Pub. L. 102-256, § 2(a), 28 U.S.C. 1350 note. "The TVPA thus recognizes explicitly what was perhaps implicit in the Act of 1789—that the law of nations is incorporated into the law of the United States and that a violation of the international law of human rights is (at least with regard to torture) *ipso facto* a violation of U.S. domestic law." *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 105 (2d Cir. 2000). Thus, in enacting the TVPA, Congress essentially created an express private right of action for individuals victimized by torture and extrajudicial killing that constitute violations of *jus cogens* norms. *See* S. Rep. No. 102-249, at 8 (1991) ("[B]ecause no state officially condones torture or extrajudicial killings, few such acts, if any, would fall under the rubric of 'official actions' taken in the course of an official's duties.").

## C.   SOI from the State Department

In its SOI, the State Department submitted a suggestion of non-immunity. The SOI highlighted the fact that Samantar "is a former official of a state with no currently recognized government to request immunity on his behalf" or to take a position as to "whether the acts in question were taken in an official capacity." J.A. 71. Noting that "[t]he immunity protecting foreign officials for their official acts ultimately belongs to the sovereign rather than the official," J.A. 71, the government reasoned that Samantar should not be afforded

immunity "[i]n the absence of a recognized government . . . to assert or waive [Samantar's] immunity," J.A. 73. The second major basis for the State Department's view that Samantar was not entitled to immunity was Samantar's status as a permanent legal resident. According to the SOI, "U.S. residents like Samantar who enjoy the protections of U.S. law ordinarily should be subject to the jurisdiction of the courts, particularly when sued by U.S. residents" or naturalized citizens such as two of the plaintiffs. J.A. 71.

Both of these factors add substantial weight in favor of denying immunity. Because the State Department has not officially recognized a Somali government, the court does not face the usual risk of offending a foreign nation by exercising jurisdiction over the plaintiffs' claims. Likewise, as a permanent legal resident, Samantar has a binding tie to the United States and its court system.

Because this case involves acts that violated *jus cogens norms*, including torture, extrajudicial killings and prolonged arbitrary imprisonment of politically and ethnically disfavored groups, we conclude that Samantar is not entitled to conduct-based official immunity under the common law, which in this area incorporates international law. Moreover, the SOI has supplied us with additional reasons to support this conclusion. Thus, we affirm the district court's denial of Samantar's motion to dismiss based on foreign official immunity.

### IV.

For the foregoing reasons, we affirm the district court's denial of both head-of-state and foreign official immunity to Samantar.

*AFFIRMED*